Jersey Joe **GILBERT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–91–00243–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 15, 1992.

Sybil Carr–Fitzgerald, Houston, for appellant.

John B. Holmes, Dist. Atty., Linda West, Marc Brown, Asst. Dist. Attys., Houston, for appellee.

Before OLIVER–PARROTT, C.J., and O'CONNOR and WILSON, JJ.

## OPINION

WILSON, Justice.

Appellant was indicted for murder. A jury found him guilty of voluntary manslaughter through the use of a deadly weapon, and sentenced him to 17 years confinement. Following his conviction, appellant timely filed a motion for new trial and an amended motion for new trial, which the trial court denied. This appeal follows, alleging four points of error. We affirm.

The record reflects that on August 19, 1988, at around 9:00 p.m., two witnesses were standing outside the Westway Ford dealership on the Southwest Freeway in Harris County when they heard two loud noises, which sounded like backfires, coming from the freeway. They next observed a woman exiting from the passenger side door of a small pickup truck, which was stopped in the emergency lane, next to the freeway. The woman staggered across a nearby service road in front of the car of a

third witness, who saw the woman was bleeding from the left side of her neck. All three witnesses testified a man exited from the driver side of the same pickup truck and followed the woman across the service road toward the dealership. When he reached her, he shot her once in back of the head at close range. The witnesses watched as the woman fell or was pushed into a ditch, and the man then jogged back to the truck and left the scene. None of the witnesses testified the woman possessed a weapon, or that she struggled with the man who shot her.

The deceased was identified as Wanda Lene Nash Hebert. The autopsy revealed that Hebert received two gunshot wounds. One entered the left side of the neck, and the other was a contact[1] wound to back of the neck.

Appellant admitted later to police officers in Beaumont that he was with Hebert at the time of the incident in question. Appellant testified at trial he did not intend to kill Hebert, but that she was shot following a struggle over two guns she pulled from her purse as they were driving. He testified they struggled as he attempted to pull his truck off the highway, that he heard shots but did not know who was hit at the time, that Hebert pulled him out of the truck with her, and when she fell and did not respond, he panicked and drove to Beaumont. Appellant identified a blue steel revolver, recovered from his truck in Beaumont, as the weapon he and Hebert struggled over. A second revolver containing five live rounds, was recovered from the crime scene near Hebert's body.

## I. JUROR MISCONDUCT

In his first point of error, appellant contends that the trial court erred in denying his motion for mistrial based on juror misconduct during voir dire. We construe appellant's point of error as claiming a denial of due process in the jury selection process. Appellant argues persons biased against him were seated on the jury.

Kathleen Hensarling, a member of the venire who was not seated as a juror, con-tacted the trial judge by telephone on the morning of January 16, 1991, the second day of trial. She informed the judge that certain prospective jurors had made comments or engaged in conduct that concerned her. She further informed him that two of those prospective jurors had been selected for appellant's trial. That same morning, the judge retired the jury and conducted a hearing. In addition to Hensarling, jury members Mary Lee Moton and Mary L. Busby were called to testify.

Hensarling testified that prospective juror Joseph Johnson made the remark that appellant "must be guilty" because "they wouldn't have brought him in and gone through all this" were he innocent. He and venire members Moton and Busby then laughed and Moton said "yeah." Hensarling further testified that the three had been "laughing and talking among each other for a period of time previous to that [remark]," and that "they were kidding because the defense was taking each juror by turn and it was a long process." Finally, Hensarling testified that Moton had written notes on a piece of paper from her checkbook, such as "[T]he Judge is taking a nap," and "[It] doesn't look like I'm going to work today."

Juror Moton testified she recalled Johnson's remark about appellant's guilt, but she did not laugh or write any notes. She further testified she could be a fair and impartial juror.

Juror Busby testified that she also recalled Johnson's remark, but she did not laugh at it. She further testified that she did recall seeing a note, but was unsure whether Johnson passed it to Moton, or vice versa. Busby also testified she could be a fair and impartial juror. Johnson was not a member of the jury and was not called to testify at the hearing.

The judge admonished jurors Moton and Busby not to discuss this hearing with the other jurors until after the trial. At the conclusion of the hearing, appellant moved for a mistrial based on juror misconduct, which was overruled. Appellant's motion

---

1. "Contact" means that the barrel of the gun was touching the skin at the time it was fired.

for new trial on this ground was also denied.

Because Moton and Busby were not jurors at the time of the alleged misconduct, the issue is not one of juror misconduct, but rather denial of due process. *Washburn v. State*, 692 S.W.2d 576, 578 (Tex. App.—Houston [1st Dist.] 1985, no writ). Appellant does not specifically cite due process as a ground for new trial in connection with his juror misconduct allegation. He does, however, claim that the conduct of Moton and Busby during voir dire denied him a fair and impartial trial. He contends that because Hensarling testified she saw Moton with a note, and Busby testified she saw a note being passed, Moton's failure to recollect any note was not credible. Therefore, Moton's responses during voir dire were unreliable, and a mistrial should have been granted.

The court heard conflicting evidence about the alleged passing of notes during voir dire. It is well settled that the trial court, as trier of fact, is the sole judge of the credibility of witnesses and is free to accept or reject all or any of their testimony. *Snow v. State*, 721 S.W.2d 943, 946 (Tex.App.—Houston [1st Dist.] 1986, no writ). Both Busby and Moton stated they heard Johnson's remark, but did not laugh or respond to it. Both women also testified they could be fair and impartial jurors. The trial court judge was able to observe the demeanor and reactions of the witnesses, and under the facts presented, was within his discretion to believe their testimony, and reject Hensarling's evidence.

■ Johnson's remark that appellant "must be guilty," if made seriously, or if believed, would demonstrate bias against appellant. But, Johnson was not selected as a juror. The judge heard conflicting evidence regarding Busby's and Moton's responses to Johnson's remark, and regarding the passing of the notes. Issues of fact as to jury misconduct are for the determination of the trial court, and where there is conflicting evidence, there is no abuse of discretion if the motion is overruled. *Bratcher v. State*, 771 S.W.2d 175, 188 (Tex.App.—San Antonio [4th Dist.]

1989, no writ). We find no abuse of discretion in the trial court's overruling appellant's motion for mistrial.

Appellant's first point of error is overruled.

## II. FAILURE TO PRESERVE EVIDENCE

■ In his second point of error, appellant alleges the State's failure to preserve evidence that might have played a significant role in his defense denied appellant his right to due process of law. Specifically, appellant contends the State's failure to conduct tests on the victim's hands to determine whether she might have recently fired a gun was reversible error. Appellant argues such evidence would have been useful in demonstrating he acted in self-defense.

Officer Mary Lentschke, the crime scene unit officer, testified that following her examination of the crime scene, she went to the Harris County morgue to take some photographs and to place bags over the victim's hands. Officer Lentschke further testified she did place the bags over the victim's hands, and she did not notice anything particularly unusual about them. She testified bags are placed on hands to retain evidence that may be present on them. When asked if that evidence might include evidence the person had been shooting a gun, Officer Lentschke responded, "it could." She further testified she did not personally receive any test results on the victim's hands because such tests are the responsibility of morgue personnel.

During pretrial proceedings, the prosecutor explained the lack of any test results on the victim's hands on the record as follows:

> With regard to the results of the victim's hands being bagged out at the scene, Mr. Rees went, Bob Rees, an investigator [with] the District Attorney's Office, went to H.P.D. Crime Lab and talked to Doug Martinson and he found the file on this case and there was no indication any tests were done on any bags submitted. He went to the Firearms Lab and also they vouched in their investigation there were no tests done regarding any bags

being submitted. At that point I talked to the officer who was reported to do the bags on the case and she indicated that she was ordered to bag the victim's hands and she did in fact bag the victim's hands and she expected them to be tested at the Medical Examiner's Office. The Medical Examiner's Office reflects no tests being done on the bagged hands. There are no test results.

■ In order to determine whether the State's investigative process violated appellant's right to due process of law, we look to the "totality of the circumstances" of that investigation. *Ex parte Brandley,* 781 S.W.2d 886, 892 (Tex.Crim.App.1989) *cert. denied,* —— U.S. ——, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990). Absent a showing of bad faith, failure to preserve potentially useful evidence does not, in and of itself, result in the denial of due process of law. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *Brandley,* 781 S.W.2d at 892. Such a failure, however, in combination with other factors, can create the cumulative effect of a denial of a defendant's due process rights. An investigative procedure that, considered in its totality, results in a trial lacking the rudiments of fairness violates the principle of due process. *Brandley,* 781 S.W.2d at 894.

Appellant does not allege that the Houston Police Department or the Harris County Medical Examiner's Office acted in bad faith in failing to conduct tests on the victim's hands, nor does he allege that other aspects of the State's investigation unfairly tainted his trial. Appellant's sole contention is the State failed to preserve evidence which might have played a significant role in his defense.

Appellant relies on *Brandley* for his claim. In *Brandley,* the Texas Court of Criminal Appeals reversed the murder conviction of a defendant, in part, because of the State's apparent refusal to conduct certain tests on the physical evidence. The failure to conduct tests, however, was only one of several factors in the State's investigation that were cumulatively judged to have denied the defendant's due process

rights. 781 S.W.2d at 894. Furthermore, the Court of Criminal Appeals noted the conviction was based entirely on circumstantial evidence, and that State misconduct is more likely to affect a trial based on circumstantial evidence than one based on direct evidence. 781 S.W.2d at 892. In the present case, appellant's conviction was based on the direct testimony of three eyewitnesses, and his own admission he was present at the scene.

Appellant's second point of error is overruled.

## III. ADMISSION OF LETTER

■ In his third point of error, appellant contends the trial court erred in admitting into evidence, over objection, a letter written by appellant to the victim.

During direct examination, appellant testified he did not intend to kill Hebert on the night of her death. On cross-examination, the following exchange occurred between appellant and the prosecutor:

Q: Were you upset because you were afraid of losing Cookie [appellant's nickname for Hebert] after the sacrifices you made in your relationships?

A: No, I wasn't upset. I was divorced. I had accepted that and like I said, I had a good job and a good future. I could have gone on with my life. That wasn't our problem. We didn't have a love relationship or another individual, nothing like that getting in. That wasn't our problem.

After the defense rested its case, the State recalled appellant to the stand for purposes of rebuttal. The record reflects the following exchange:

Q: Do you recall yesterday in response to my questioning I asked you if you felt that you had given up everything for Cookie: Lost your previous wife, lost your daughter, made great sacrifices with Cookie and that you felt upset with the way your relationship was going with Cookie?

A: Yes.

Q: And I asked you if you were upset with Cookie because of everything you had given up for her.

A: Yes.

Q: Do you remember me asking you that?

A: Yes.

Q: And what was your answer to that?

A: It was "no."

PROSECUTOR: May I approach the witness?

(At this time, the [letter] was marked State's exhibit No. 23 by the reporter.)

Q: Sir, I'm going to show you what's been marked as State's exhibit No. 23 and ask you if you recognize it.

A: Yes, I do.

Q: Could you tell the ladies and gentlemen of the jury what it is?

A: It was a letter I wrote to Cookie. We had a problem with—about drugs.

DEFENSE COUNSEL: Your Honor, I object as to the witness going further into it.

THE COURT: Well, Counsel, you can—just answer the question.

Q: When did you write it?

A: It would be August the 8th, '88.

Q: Would that be approximately 11 days before this killing happened?

A: August the 8th.

Q: And did you write this?

A: I did.

Q: To the victim?

A: Yes.

Q: I'd like to direct your attention to the bottom part of this letter that you wrote.

DEFENSE COUNSEL: Your Honor, I object to Counsel asking the witness about anything from that letter because the letter, first of all, has not been admitted into evidence.

THE COURT: Sustained.

PROSECUTOR: Your Honor, I'm giving him an opportunity to explain an inconsistent statement he's just made on a jury—I mean, on the witness stand in front of the jury.

THE COURT: All right.

Q: Could you read this to the jury, please?

A: The inside letter?

Q: No. Starting here where it says, "I lost my ..."

A: "At least you got your kids and all of your—" say what "—and all of your so-called friends to talk to, but I lost my relation—but I lost my relationship with everyone because of loving you, even my daughter."

Q: Thank you. "Even—"

PROSECUTOR: Your Honor, at this time, I would offer State's exhibit No. 23 into evidence and tender it to defense counsel for her inspection and possible objection.

At that point in the proceeding, the jury was removed and defense counsel objected to the admission of the letter on the grounds of relevance, prejudice, remoteness, and violation of the Court's discovery order. These objections were overruled and the letter was admitted into evidence.

The letter was then published to the jury by the prosecutor as follows:

August 8th, 1988, 10:30 a.m.

Dear Cookie:

I don't know how to start this letter off. I'm very upset, and it seems as though life isn't worth it anymore. I'm sorry what happened. And I know you know that, but you provoked it.

I've called to no avail trying to talk to you, but your sweet little daughter wants to talk shit when she don't know what's going on. I didn't have any plans to mistreat you.

You wasn't slick. I could have fucked up your car so that you couldn't run or tied you up. But I wanted you to get some rest and clear your head up, and maybe we could talk things over. But you chose to run and go get everybody involved and upset when this is between you and I.

At least you got your kids and all of your so-called friends to talk to, but I lost my relationship with everyone because of loving you, *even my daughter.*

Cookie, I'm to the point now that I don't care what happens now because I got too

many problems to deal with, and I can't cope.

We've always been able to talk, but it seems as though you'd rather get drunk and eat pills than face the problem.

Bea said some ugly little things to me, but I'm certain she and plenty of others are going to be sad before this is all over.

Oh, yes. I'm not scared of her policeman friend because I haven't broken any laws up there. I respect your mother a lot, and that's the *only* reason I didn't come up there.

And I wouldn't want that on my conscience. Because if I set my mind at it, I think I could protect myself and suffer the consequences after I finished.

Cookie, you waited until I was on my ass before you told me that I had my priorities out of order, and you feel as though material things is what love and life is all about.

I told you that I liked the shirt, and I guess that wasn't too good enough for you. I would have rather you taken them back with you because every time I look at them, I can see you.

I took a leave of absence from my job this morning, and I'm not going back until I get finished. I don't know what to say to you on this paper because you know what the problem is.

I know everybody is going to read this, even Bea's police friend. Fine.

I need to hear from you Cookie, now. Cookie, let's not let things get out of hand. Please, for God's sake.

Love you, Joe.

(Emphasis original.)

On cross-examination by defense counsel, appellant testified his letter referred to Hebert's drug problem. Appellant testified his statement in his letter that "I'm not going back until I get finished" referred to his trip to Hebert's hometown to talk to the district attorney about doctors who were giving Hebert pills. He also testified his statement in the letter about Hebert's car was a reference to an occasion when he took her car keys because she was sick from drugs.

Appellant first contends the prosecutor failed to lay a proper predicate for impeachment by prior inconsistent statement. Specifically, appellant contends the prosecutor, when questioning appellant on rebuttal, failed to ask appellant whether appellant made the alleged contradictory statement at a particular time, to a particular person, and at a particular place. However, appellant's counsel failed to make this particular objection at trial. An error presented on appeal must be the same as the objection raised at trial. *Sharp v. State,* 707 S.W.2d 611, 619 (Tex.Crim.App.1986). In addition, the prosecutor did, in fact, ask appellant when he wrote the letter and whether it was written to the victim.

Appellant also contends that admission of the letter deprived him of a fair trial because of its alleged remoteness, irrelevance, and prejudicial nature. Section 19.06(a) of the Texas Penal Code provides that:

> In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX.PENAL CODE ANN. § 19.06(a) (Vernon Supp.1992).

Section 19.06(a) has been interpreted to permit introduction of evidence of "all 'facts and circumstances surrounding ... the previous relationship existing between the accused and the deceased' which are probative of the *material* 'condition of the mind of the accused at the time of the offense.'" *Fielder v. State,* 756 S.W.2d 309, 318 (Tex.Crim.App.1988) (emphasis original). The theories of the prosecution and the defense determine the "material" issues in each case. *Id.* at 318.[2] The court

---

2. Appellant was prosecuted under section 19.02(a)(1) of the Texas Penal Code, which provides that "a person commits [murder] if he intentionally or knowingly causes the death of

in *Fielder* acknowledged that "the relevant 'condition' of a defendant's mind is composed of the sum of his experiences with the deceased." 756 S.W.2d at 320.

Appellant testified he was not upset with Hebert and it was not his intent to kill her. His letter to Hebert, written 11 days before her death, was relevant to his condition of mind as it was probative of their previous relationship and his intent. The letter demonstrates the troubled relationship between appellant and Hebert then existing as well as appellant's emotional state because of the difficulties between the two.

■ Appellant asserts that the probative value of his letter was outweighed by its prejudicial effect. However, the Court of Criminal Appeals has noted that TEX. R.CRIM.EVID. 403 [3] "simply means that [the] trial court should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence." *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim.App.1990). Furthermore, evidence of threats or altercations between the victim and the accused are admissible to show relevant facts and circumstances surrounding the offense, the relationship between the victim and the accused, and the condition of the accused's mind at the time of the offense. *Hall v. State*, 640 S.W.2d 307, 309 (Tex.Crim.App.1982). Appellant's statements that "I'm very upset, and it seems as though life isn't worth it anymore," that "I'm to the point now that I don't care what happens," and that "plenty of people are going to be sad before this is all over," speak directly to the issue of his condition of mind.

■ Appellant contends that it was error for the trial court to admit the entire letter, rather than limiting admission to that portion of the letter which was inconsistent with appellant's prior statement at trial and instructing the jury to consider it only for impeachment purposes. The record demonstrates, however, that the letter was not admitted for purposes of impeachment. Rather, the letter in its entirety was admitted to show the prior relationship between appellant and the victim, to defeat appellant's claim of self-defense, and to show appellant's state of mind. As previously discussed, such an admission was proper under TEX.PENAL CODE ANN. § 19.-06(a).

■ Finally, even though parts of the letter may have been inadmissible, appellant made no specific objection to parts of the letter. "[W]hen an exhibit contains both admissible and inadmissible material the objection must specifically refer to the material deemed objectionable." *Beltran v. State*, 728 S.W.2d 382, 387 (Tex.Crim. App.1987).

Appellant's third point of error is overruled.

## IV. NEW TRIAL

In his fourth point of error, appellant contends the trial court abused its discretion in failing to grant his motion for new trial.

This point of error is multifarious and presents nothing for review. *Rivera v. State*, 808 S.W.2d 80, 95 (Tex.Crim.App. 1991), *cert. denied* —— U.S. ——, 112 S.Ct. 279, 116 L.Ed.2d 231 (1991).

Many of appellant's arguments under this point of error are merely restatements of arguments in other grounds of error, multiple arguments and meritless grounds upon which a new trial should have been granted.

---

an individual," or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX.PENAL CODE ANN. § 19.02(a)(1), (2) (Vernon 1989). Therefore, the material "condition of mind" issues included whether it was appellant's "conscious objective or desire" to cause Hebert's death at the time of the homicide, and whether appellant was "aware that his conduct [was] reasonably certain to cause" her death. TEX.PENAL CODE ANN. § 6.03(a) and (b)

(Vernon 1989); *see also Fielder*, 756 S.W.2d at 318.

3. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX.R.CRIM.EVID. 403 (Vernon Supp.1992).

An additional argument is that a new trial should have been granted because new evidence became available when Mr. Robert T. Wilson and Ms. Debra McBride were located. Mr. Wilson was the driver behind appellant when the incident began, and apparently would testify to the erratic motion of appellant's truck. Ms. McBride was a friend of Hebert's. Given the eyewitness accounts to the shooting, and appellant's own admission, neither individual's testimony would have had a probability of bringing about a different result in a new trial. *See Drew v. State,* 743 S.W.2d 207, 226 (Tex.Crim.App.1987).

Appellant's final argument is that the verdict was contrary to the law and the evidence, because of conflicting witness testimony. Again, the eyewitness accounts of the incident are sufficient to sustain the verdict.

Appellant's fourth point of error is overruled, and the judgment is affirmed.