Michael T. BALEW, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–93–085 CR.

Court of Appeals of Texas,
Beaumont.

March 16, 1994.

Discretionary Review Refused
June 15, 1994.

Barry R. Bryan, Lufkin, for appellant.

Guy James Gray, Dist. Atty., Patrick O. Hardy, Asst. Dist. Atty., Jasper, for state.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Aggravated Sexual Assault. Following their "guilty" verdict, the jury assessed appellant's punishment at ninety-nine (99) years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises two points of error on appeal, viz:

> Point of Error 1: The lower court erred in finding appellant's written confession to have been voluntarily made and in admitting the written confession into evidence.

> Point of Error 2: The State's investigative procedures violated appellant's right to due process of law and a fundamentally fair trial.

As is obvious from the content of the above two points of error, appellant does not complain of the sufficiency of the evidence before the jury to sustain his conviction. The record before us does contain a statement of facts from a pretrial *Jackson v. Denno*[1] hearing. At the conclusion of the hearing, the trial court found appellant's written statement to have been voluntarily given and, therefore, admissible at trial. The trial court made no written findings of fact or conclusions of law as recommended by *Martinez v.*

---

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

*State,* 437 S.W.2d 842 (Tex.Crim.App.1969).[2] Appellant argues that the combination of appellant's individual psychological characteristics along with the overbearing actions of the authorities in eliciting the inculpatory statement resulted in said statement being involuntary.

We have carefully reviewed all of the testimony from the *Jackson v. Denno* hearing. The State called two witnesses, James Havard, an investigator for the Jasper County Sheriff's Office, and Mike Wilson, a detective for the city of Jasper Police Department. Havard was the arresting officer and Wilson typed appellant's statement as appellant verbally related events surrounding the sexual assault on the nine-month-old female victim. Havard testified that appellant was arrested pursuant to an arrest warrant for the alleged offense on October 4, 1992. Havard stated that at the time of arrest, appellant was provided with *Miranda*[3] warnings. Havard further testified that appellant was then taken before a magistrate and "arraigned," again with the full complement of *Miranda* warnings.[4] Appellant was questioned twice on October 4, and maintained on both occasions that he did not remember any of the events as he had been drinking heavily all day the previous day and well into the early hours of October 4.

Havard testified that he again initiated questioning of appellant the afternoon of October 5. On this occasion, Jasper County District Attorney Guy James Gray was also present. Havard testified that, once again prior to questioning, appellant was provided with full *Miranda* warnings. At some point during the questioning, appellant began to tell what he remembered about the alleged sexual assault on the nine-month-old infant. The details appellant provided involved the penetration of the victim's vagina by appellant's finger, and, inferentially, by appellant's penis. At this point, Detective Wilson was called to come and reduce appellant's statement to writing. Wilson testified that Investigator Havard called on October 5 to come to the Jasper County Jail and bring the portable word processor that Wilson used for typing up statements. Wilson further testified that once he was set up, he "asked the defendant to start at the beginning and tell me what happened." Significant to our analysis of this point of error is the testimony from both Havard and Wilson that appellant was read his *Miranda* rights prior to making the statement, that appellant acknowledged that he understood said rights, and that appellant verbally agreed to waive said rights and voluntarily provided the statement. Furthermore, Havard testified that neither threats nor coercion were directed toward appellant during any of the questioning, nor any promises made to appellant in exchange for his statement. We take note of the fact that both Havard and Wilson were vigorously and thoroughly cross-examined by appellant's trial counsel on the various issues that could affect the voluntariness of the statement, but neither Havard nor Wilson were shaken in their assertion that appellant's statement was anything but completely voluntary. On the face of the statement Havard's signed certification that he read appellant the *Miranda* warnings appears as well as the following language from the body of appellant's statement:

> Prior to questioning and prior to making this statement, I was read the above rights by the above-named officer. I understand the above rights and I do not wish to consult with a lawyer. I give the following

---

2. Such findings are always helpful to the appellate courts. The failure, however, to make written findings of facts is not reversible error. *Barnhill v. State,* 657 S.W.2d 131, 132, n. 1 (Tex.Crim.App.1983). *But cf. Wicker v. State,* 740 S.W.2d 779, 784 (Tex.Crim.App.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 278 (1988) (The proper procedure is to abate the appeal with directions to the trial judge to reduce to writing his/her findings on the disputed issues surrounding the taking of appellant's statement. An objection to the lack of written findings may be raised for the first time on appeal. *Id.* at 783.

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. We take note of the fact that although Investigator Havard characterized the proceeding as an "arraignment," the proceeding was more properly a "magistratizing" of appellant. *See Watson v. State,* 762 S.W.2d 591, 594, n. 4 (Tex.Crim.App. 1988).

statement knowingly, intelligently, and voluntarily, and am waving (sic) my rights prior to and during this statement:....

At the conclusion of the State's evidence on voluntariness, appellant took the witness stand in his own behalf. His testimony in general can be characterized as somewhat disjointed as well as inconsistent with his appellate claim of involuntariness regarding his statement. As we appreciate the entirety of appellant's testimony of the events surrounding the elicitation of his statement, it is that appellant did not really remember the events surrounding the discovery of the sexual assault of the infant by her mother; that while no specific or definite promises were made to appellant in exchange for his statement, District Attorney Gray stated that he would get appellant "some help;" that no physical or verbal threats were made to appellant, but District Attorney Gray stated at one point during the questioning, "There's an easy way and there's a hard way[;]" and that appellant's subjective interpretation of this remark by Gray was, "In other words, that's—it was like—in other words, that was the easy way, to go ahead and make a statement, or, you know, it would be hard if he had to—it would be harder on me if I waited until it [the DNA test results] come back and it showed that I'd done it." We believe the key to appellant's state of mind at the time his statement was given, *and* his state of mind as he testified at the hearing was: provided during cross-examination of appellant by the State:

Q. (the State) All right. So, what you're really saying is that you didn't—now—you didn't know exactly if you did it or not and you gave this statement, and now you'd like to go back to saying I don't really know if I did it or not?

A. (appellant) Yes, sir.

Appellant also called Terry Knight, a felony probation officer with Angelina County who is also a chemical and alcohol abuse counselor. Appellant's trial counsel was apparently attempting to show that at the time appellant gave his statement he (appellant) could have still been intoxicated or in the grip of the "DTs," and therefore unable to provide a knowing and voluntary waiver of his *Miranda* rights. The testimony of Mr. Knight reflects, however, a very equivocal discussion of the physical capacity of various hypothetical individuals to retain the effects of or to burn off alcohol in beverages over time. There was no testimony as to how appellant's particular physical system would have reacted to the amount of alcohol he allegedly consumed on the day in question.

Appellant's final witness at the voluntariness hearing was Dr. Frankie Clark, a psychologist who had previously interviewed appellant and administered appellant a variety of psychological and intelligence tests. The pertinent portion of Dr. Clark's brief bit of testimony is as follows:

Q. (counsel for appellant) All right. How long was your interview?

A. (Dr. Clark) The interview was—just the interview was about 45 minutes.

Q. As far as the results that you got from these tests, can you tell us generally your profile or results on these regarding personality, and just tell us what you found?

A. I also gave a Wexler, which is an intelligence test on that. What I found with Mr. Balew is that he is operating in the low average range of intelligence. I found him to be very depressed, very anxious, very frightened at this moment. I found his personality profile, I would think that he would be rather shy, easily led, easily intimidated. He's an alcoholic, has a long history of drinking, black outs. That's basically the overall picture.

Q. Somebody that has a history of drinking and black outs, is it possible that someone could suggest something to them that they might have done while they were blacked out and them believe it? Or more specifically, Mr. Balew, you say he's easily lead (sic).

A. Anyone who has a history of black outs, unfortunately has been told frequently about things that they didn't know they did, so it's possible that he could be suggested—he could be suggested that something happened and he might agree. He's also fairly easily intimidated according to my testing, which would make him even more susceptible.

Q. So, if he were in a pressure situation and being pushed, he could be led to do something he might not normally do?

A. That's a possibility, yes, sir.

■ It is axiomatic that the trial court is the sole judge of the credibility of the witnesses as well as the weight to be given to their testimony at a hearing on the voluntariness of a confession. *Miniel v. State,* 831 S.W.2d 310, 315 (Tex.Crim.App.), *cert. denied,* — U.S. —, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992). Absent an abuse of discretion, the trial court's findings will not be disturbed on appeal. *Id.* In the instant case, we find no abuse of discretion in the trial court's finding that appellant's statement was voluntarily given. While the credibility of Mr. Knight and Dr. Clark was probably not a major consideration for the trial court, the weight of their testimony, *in light of appellant's testimony,* can reasonably be seen to have been reduced to a negligible level, as appellant's basic position, set out *infra,* was that although he did not remember anything about the alleged offense, and having been warned of his *Miranda* rights he, nevertheless, provided the authorities with a statement of his involvement in the sexual assault, *but now,* appellant wanted the trial court to believe that he (appellant) never really remembered anything at all and merely parroted words suggested to him by the authorities because of a vague promise of "help" and the "easy way ... hard way" statement which appellant interpreted as some sort of heavily veiled threat. The trial court was free to believe the State's witnesses that appellant's statement was completely voluntarily. Again, there was no abuse of discretion on the part of the trial court in admitting the statement before the jury. Point of error one is overruled.

The crux of appellant's second point of error combines a revisitation of a portion of his complaint in point of error one (that the promise of DNA testing of hair, semen, and blood samples led to appellant providing an array of inculpatory items, including his statement), with the allegation that "[a]t trial Appellant was struck again when he learned that the DNA analysis, which could potentially provide helpful evidence on his behalf, had

not been done and been cancelled at the request of District Attorney Gray, who had previously told him that waiting for the results would make things go harder." We will not again discuss any alleged promises made to appellant in exchange for his cooperation with the police investigation. As the evidence reflected that appellant was made no promises nor coerced into cooperating with the authorities, this portion of appellant's argument will not be considered by this Court.

■ Appellant argues that the State's failure to have DNA testing performed on the various evidentiary items collected from the scene of the crime, from the victim's person, from appellant's person, and from the person of Ronnie Davis, denied appellant due process in that the State's investigative procedure resulted in a trial which lacked the rudiments of fairness, citing *Ex parte Brandley,* 781 S.W.2d 886 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 817, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990); and *Gilbert v. State,* 840 S.W.2d 138 (Tex.App.—Houston [1st Dist.] 1992, no pet.). The *Gilbert* case provides a discussion of the applicable law regarding claims of improprieties in the State's investigative procedures for due process purposes, *viz:*

In order to determine whether the State's investigative process violated appellant's right to due process of law, we look to the "totality of the circumstances" of that investigation. *Ex parte Brandley,* [cite omitted]. Absent a showing of bad faith, failure to preserve potentially useful evidence does not, in and of itself, result in the denial of due process of law. *Arizona v. Youngblood,* 488 U.S. 51, [57,] 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *Brandley,* 781 S.W.2d at 892. Such a failure, however, in combination with other factors, can create the cumulative effect of a denial of a defendant's due process rights. An investigative procedure that, considered in its totality, results in a trial lacking the rudiments of fairness violates the principle of due process. *Brandley,* 781 S.W.2d at 894.

840 S.W.2d at 142.

In the instant case, the record reflects that, rather than placing itself in a position of

failing to preserve evidence, the State and the chemist from the Texas Department of Public Safety agreed not to submit any of the hair evidence for DNA testing in that said process would evidently destroy a significant portion of the hair being tested. The chemist's testimony further reflects that, because no semen was present in the rape kit taken from the victim, the hair evidence would have been the only items submitted to their laboratory in which DNA testing results would have had any relevance to the instant prosecution. The chemist stated that DPS laboratory in Austin was not even conducting DNA testing at that time, and that no laboratories in the state of Texas customarily did DNA testing on hair.

With regard to the testing done at the DPS laboratory in Austin and the test results, we note the fact that appellant's trial counsel admitted immediately prior to the beginning of the trial that the State "has furnished us everything he says that he has we've asked for in discovery and there's no further evidence." The State replied, "I'd like the record to reflect there has been an open file, that he's read the offense reports and everything that I have available in my file." Appellant's counsel responded affirmatively to this statement. We also note that admitted into evidence during trial was State's Exhibit 17, the DPS laboratory report on all items of physical evidence submitted by the Jasper County authorities and subsequently analyzed by the DPS chemist. The report, dated "December 3, 1992," was addressed to District Attorney Gray. Even allowing for one week in the mail, said report presumably arrived at the District Attorney's office well over two months prior to the start of the instant trial. With the uncontroverted open-file policy regarding the instant case, as well as trial counsel's acknowledgment that the State provided "everything" asked for, we find the trial and appellate strategy utilized by appellant in alleging surprise, investigative impropriety, and harm, resulting from the absence of DNA testing, extremely strained. The contents of the report makes no mention of any DNA testing or analysis requested by the submitting agency. In examining the State's investigative procedures in their totality, we find no merit in appel-

lant's complaint of a denial of due process. The record reflects no investigative improprieties, and certainly no bad faith on the State's part with regard to the handling and scientific analyses of the physical evidence involved in this case. Point of error two is overruled; the judgment and the sentence of the trial court are affirmed.

AFFIRMED.