In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00204-CR
______________________________


JAMES GLENN JACOBS, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 30641-B


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â During an investigation of a one-car accident, James Glenn Jacobs was discovered face
down, intoxicated, and unconscious in a ditch about 200 to 400 yards from the wrecked vehicle. 
Jacobs appeals his conviction of felony driving while intoxicated (DWI). A jury found Jacobs guilty
and assessed punishment at nine years' imprisonment. Jacobs alleges that the trial court erred in
admitting into evidence medical records containing double hearsay and that the evidence was both
legally and factually insufficient to support the verdict. We affirm the judgment of the trial court.
Admission of Medical Records
Â Â Â Â Â Â Â Â Â Â Â Â In his first point of error, Jacobs contends the trial court erred in admitting the medical
records. Medical records concerning the accident were introduced under the "business records"
exception to the hearsay rule. The custodian of medical records testified that she was the legal
custodian of the business records in question, that the records were kept in the regular course of
business, and that the information contained in the records was recorded by an employee of the
hospital at or near the time of the stated events. Because Jacobs was the only person found at the
scene, Jerry Cobb, an emergency medical technician with the Longview Fire Department, assumed
Jacobs was the driver and informed hospital personnel that Jacobs was the driver. The medical
reports, consisting of more than forty pages, provide, among numerous other entries, that "[t]he
patient is a 30 year-old intoxicated white male who is status post motor vehicle accident, driver."
Â Â Â Â Â Â Â Â Â Â Â Â A trial court's decision on the admissibility of evidence is reviewed for an abuse of discretion. 
Bee v. State, 974 S.W.2d 184, 187 (Tex. App.âSan Antonio 1998, no pet.). A trial court abuses its
discretion when its decision falls outside "the zone of reasonable disagreement." Salazar v. State,
38 S.W.3d 141, 153â54 (Tex. Crim. App. 2001). The test for an abuse of discretion is not whether,
in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action;
rather, it is a question of whether the court acted without reference to any guiding rules or principles,
and the mere fact that a trial court may decide a matter within its discretionary authority differently
than an appellate court does not demonstrate such an abuse. Montgomery v. State, 810 S.W.2d 372,
391 (Tex. Crim. App. 1990) (op. on reh'g). 
Â Â Â Â Â Â Â Â Â Â Â Â The general rule is that hearsay statements are inadmissible. See Tex. R. Evid. 802. Hearsay
is defined as "a statement, other than one made by the declarant while testifying at the trial or
hearing, offered in evidence to prove the truth of the matter asserted." See Tex. R. Evid. 801(d);
Huff v. State, 897 S.W.2d 829, 838â39 (Tex. App.âDallas 1995, pet. ref'd). However, there are
numerous exceptions to the hearsay rule. See Tex. R. Evid. 803. Rule 803(6), commonly known
as the "business records exception" provides that
A memorandum, report, record, or data compilation, in any form, of acts, events,
conditions, opinions, or diagnoses, made at or near the time by, or from information
transmitted by, a person with knowledge, if kept in the course of a regularly
conducted business activity, and if it was the regular practice of that business activity
to make the memorandum, report, record, or data compilation, all as shown by the
testimony of the custodian or other qualified witness, or by affidavit that complies
with Rule 902(10), unless the source of information or the method or circumstances
of preparation indicate lack of trustworthiness.

Tex. R. Evid. 803(6) (emphasis added). The purpose of the "business records" exception is to
"dispense with the necessity of proving each and every book entry by the person actually making
such entry." Crane v. State, 786 S.W.2d 338, 353 (Tex. Crim. App. 1990). 
Â Â Â Â Â Â Â Â Â Â Â Â Even if the formal requirements of the exception are shown, the indispensable, fundamental
trustworthiness of the proffered record must be evident, including the requirement that the records
have the "'indicia of reliability.'" Id. Even if a record qualifies as a business record, not all of the
contents of that record may be admissible. See Garcia v. State, 126 S.W.3d 921, 926 (Tex. Crim.
App. 2004) (a comment made by a person who does not have a business duty to report must
independently qualify for admission under another hearsay exception). 
Â Â Â Â Â Â Â Â Â Â Â Â Before we examine the substance of Jacobs' point of error, we must determine whether error
has been preserved. Any error in admitting evidence must have been preserved by a proper objection
and ruling. Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); Skeen v. State, 96
S.W.3d 567, 575 (Tex. App.âTexarkana 2002, pet. ref'd). The objection must have been timely and
include the basis for the objection unless the particular ground was apparent from the context. 
Lankston v. State, 827 S.W.2d 907, 908â09 (Tex. Crim. App. 1992); Skeen, 96 S.W.3d at 575. 
Â Â Â Â Â Â Â Â Â Â Â Â Specific objections are required to preserve error in order to afford the trial court the
opportunity to rule and allow the opposing counsel an opportunity to remedy the defect or supply
other testimony. Johnson v. State, 901 S.W.2d 525, 533 (Tex. App.âEl Paso 1995, pet. ref'd). 
Rule 33.1(a)(1)(A) requires that an objection state the grounds for the ruling being sought "with
sufficient specificity to make the trial court aware of the complaint." Tex. R. App. P. 33.1. Such
specificity is not required, though, if "the specific grounds were apparent from the context." Id.; see
Cofield v. State, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994). In Lankston, the Texas Court of
Criminal Appeals held that, under the predecessor to Rule 33.1, "no technical considerations or form
of words" are necessary and that all that is required is to "let the trial judge know what he wants, why
he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time
when the trial court is in a proper position to do something about it." Lankston, 827 S.W.2d at 909. 
Making the trial court aware of the complaint requires that both the grounds and what is being
objected to be apparent. See Hernandez v. State, 599 S.W.2d 614, 617 (Tex. Crim. App. [Panel Op.]
1980) (op. on reh'g).
Â Â Â Â Â Â Â Â Â Â Â Â "[W]hen an exhibit contains both admissible and inadmissible material the objection must
specifically refer to the material deemed objectionable." Beltran v. State, 728 S.W.2d 382, 387 (Tex.
Crim. App. 1987); Gilbert v. State, 840 S.W.2d 138, 145 (Tex. App.âHouston [1st Dist.] 1992, no
pet.); see Hernandez, 599 S.W.2d at 617 (op. on reh'g). In Gilbert, the First Court of Appeals held
that the failure to make an objection that specifically referred to the inadmissible parts of a letter
failed to preserve error, even though parts of the letter may have been inadmissible. Gilbert, 840
S.W.2d at 145. In Hernandez, the Texas Court of Criminal Appeals held that failure to specifically
refer to the inadmissible parts of a "pen packet" introduced at the punishment phase failed to
preserve the error in admitting the entire "pen packet." Hernandez, 599 S.W.2d at 617 (op. on reh'g). 
Â Â Â Â Â Â Â Â Â Â Â Â Jacobs was required to make an objection with sufficient specificity that the trial court could
be aware of what he was complaining about. The record in pertinent part is as follows:
[Prosecutor]: Your Honor, at this time I'm going to move to offer into
evidence State's Exhibit 1, which had been previously copied for defense counsel
prior to trial today.
Â 
(State's Exhibit 1 offered)
Â 
[Defense Counsel]: Your Honor, I believe that I'm going to object to the
records to the extent that they contain hearsay within hearsay. I understand that
they've been proved up as business records, but the hearsay in evidence, what's
contained within them, I object to.
Â 
THE COURT: No. It's a business record, it comes in, so I admit the exhibit.
Jacobs' counsel's objection did not make the trial court aware of where in the records the
objectionable material is. There is no specific reference to the inadmissible parts of the medical
records. This is not an objection specific enough to make the trial court aware of what is being
objected to. Nor can we say that the inadmissible material which forms the basis of the objection
is apparent from the context. The medical records contained approximately forty pages of entries
properly authenticated as business records, and the complained-of evidence consists of a single word. 
Therefore, we conclude the error was not preserved.
Sufficiency of the Evidence
Â Â Â Â Â Â Â Â Â Â Â Â In his second and third points of error, Jacobs contends there is legally and factually
insufficient evidence for a jury to conclude beyond a reasonable doubt that he operated the vehicle
in question. In our review of the legal sufficiency of the evidence, we employ the standards set forth
in Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to view the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Turner v. State, 805 S.W.2d 423, 427 (Tex. Crim. App.
1991). 
Â Â Â Â Â Â Â Â Â Â Â Â When reviewing a challenge to the factual sufficiency of the evidence to support the
conviction, we are required to determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding guilt beyond a reasonable doubt. Zuniga v. State, No. 539-02,
slip op. at 8, 2004 Tex. Crim. App. LEXIS 668, *20 (Tex. Crim. App. Apr. 21, 2004). There are
two ways in which we may find the evidence to be factually insufficient. First, if the evidence
supporting the verdict, considered alone, is too weak to support the jury's finding of guilt beyond a
reasonable doubt, then we must find the evidence insufficient. Id. Second, ifâwhen we weigh the
evidence supporting and contravening the convictionâwe conclude the contrary evidence is strong
enough that the State could not have met its burden of proof, we must find the evidence insufficient. 
Id. "Stated another way, evidence supporting guilt can 'outweigh' the contrary proof and still be
factually insufficient under a beyond-a-reasonable-doubt standard." Id. If the evidence is factually
insufficient, then we must reverse the judgment and remand for a new trial. Clewis v. State, 922
S.W.2d 126, 135 (Tex. Crim. App. 1996).
Â Â Â Â Â Â Â Â Â Â Â Â The elements necessary to prove that a person committed the offense of DWI are 1) a person,
(2) is intoxicated, (3) at the time of, (4) operating, (5) a motor vehicle, (6) in a public place.


 Jacobs
contends there is insufficient evidence that he was the person operating the vehicle. 
Â Â Â Â Â Â Â Â Â Â Â Â On November 9, 2002, emergency medical personnel responded to the report of a wrecked
pickup truck. The truck was stuck in a ditch with substantial damage. The pickup truck was
running, in gear, and the driver's side door was open. Jacobs was discovered face down, intoxicated,
and unconscious in a ditch about 200 to 400 yards from the wrecked vehicle. No other occupants
were found at the scene. Trooper Jay Alexander testified that the steering wheel had been damaged. 
Jacobs was diagnosed with bilateral lung contusion, bruising of the lungs, or atelectasis, collapse of
the alveoli in the lungs. The medical records indicate that pneumonia could have been a possible
cause of Jacob's injuries, but the injuries were also consistent with injury caused by a person's chest
striking a steering wheel during an accident. Cobb testified that medical tests indicated Jacobs had
a blood alcohol concentration in excess of three times the legal limit. As a result of the incident,
Jacobs was charged, in addition to the DWI, with operation of a motor vehicle in violation of the
financial responsibility law. Before the trial for DWI, Jacobs pled guilty to operation of a motor
vehicle in violation of the motor vehicle liability insurance requirement. See Tex. Transp. Code
Â§Â§Â 601.051, 601.191 (Vernon 1999). One of the elements of this offense is that one must operate
a vehicle without one of the enumerated financial responsibility measures including motor vehicle
insurance. Id. A copy of Jacobs' plea concerning the lack of insurance was introduced into evidence. 
A guilty plea is an admission of all elements of a formal criminal charge. Ex parte Williams, 703
S.W.2d 674, 678 (Tex. Crim. App. 1986). Thus, Jacobs had previously admitted his guilt to an
offense which required him to be the driver on the occasion in question.
Â Â Â Â Â Â Â Â Â Â Â Â Jacobs argues that there are numerous scenarios which would explain why only the driver's
side door was open and that Jacobs was the only person found at the scene. Jacobs contends the
driver could have pulled Jacobs out of the vehicle from the driver's side or that Jacobs could have
exited the passenger side and closed the door. The driver could have fled the scene before the
emergency medical personnel arrived. However, the State is no longer obligated to exclude every
reasonable hypothesis other than guilt in circumstantial evidence cases. See Purvis v. State, 4
S.W.3d 118, 120 (Tex. App.âWaco 1999, no pet.); see also Geesa v. State, 820 S.W.2d 154,
160â61 (Tex. Crim. App. 1991), overruled in part on other grounds, Paulson v. State, 28 S.W.3d
570 (Tex. Crim. App. 2000).
Â Â Â Â Â Â Â Â Â Â Â Â The evidence contains circumstantial evidence that Jacobs was the driver. Furthermore, by
entering a plea of guilty to driving without insurance, he admitted operating the vehicle at the time
of this accident. When viewed in a light most favorable to the verdict, a rational person could have
found Jacobs guilty beyond a reasonable doubt. The evidence supporting the verdict, considered
alone, is strong enough that a rational juror could have found Jacobs guilty beyond a reasonable
doubt. After weighing the evidence supporting and contravening the conviction, we conclude that
the contrary evidence is not strong enough that the State could not have proven guilt beyond a
reasonable doubt. Viewed in a neutral light, a rational juror could have found Jacobs guilty beyond
a reasonable doubt. Therefore, the evidence was both factually and legally sufficient.
Â Â Â Â Â Â Â Â Â Â Â Â For the reasons stated, we affirm the judgment of the trial court.
Â 


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Â 
Date Submitted:Â Â Â Â Â Â Â Â Â Â April 9, 2004
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â May 20, 2004

Do Not Publish



pelayout>









 
 
 
 
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No. 06-11-00073-CR

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  RAY CHARLES HAWKINS,
Appellant

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  V.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE STATE OF TEXAS, Appellee

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the 114th
Judicial District Court

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Smith County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial Court
No. 4-93-821

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Memorandum Opinion by Chief Justice Morriss








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MEMORANDUM OPINION

Â 

Â Â Â Â Â Â Â Â Â Â Â  During jury
selection in Ray Charles HawkinsÂ Smith County[1]
trial for indecency with a child, HawkinsÂ counsel made two Batson[2]
challenges, both of which were overruled by the trial court and which are the
basis for HawkinsÂ appeal.Â  Hawkins was
ultimately convicted and sentenced to twenty yearsÂ incarceration.[3]Â  We affirm the judgment of the trial court,
because (1)Â the State proffered manifestly race-neutral explanations for
its strikes, and (2) the trial court did not clearly err in accepting those
explanations.

Â Â Â Â Â Â Â Â Â Â Â  HawkinsÂ
Batson challenges questioned the
StateÂs peremptory strikes of two African-American veniremembers.[4]Â  The trial court, without expressly finding
Hawkins established a prima facie showing of racial discrimination, heard
testimony from the State regarding its use of peremptory strikes on the two African-American
veniremembers.Â  At the conclusion of the
hearing, the trial court overruled the Batson
challenges, finding the State expressed race-neutral reasons for the exercises
of its peremptory strikes.Â  On appeal,
Hawkins contends the StateÂs reasons for the exercise of the peremptory strikes
were a pretext for discrimination.

Â Â Â Â Â Â Â Â Â Â Â  The StateÂs
purposeful use of peremptory strikes in a racially discriminatory manner
violates the Equal Protection Clause of the Fourteenth Amendment to the United
States Constitution.Â  Batson, 476 U.S. at 89.Â  The United States Supreme Court has outlined
a three-step process for evaluating claims that the State has exercised
peremptory challenges in a manner violating the Equal Protection Clause.Â  Hernandez
v. New York, 500 U.S. 352, 358 (1991); Batson,
476 U.S. at 96Â98.Â  The defendant must
first make a prima facie showing that the State has exercised peremptory
challenges on the basis of race.Â  Hernandez, 500 U.S. at 358.Â  When this showing is made, the burden then
shifts to the State to articulate a race-neutral explanation for striking the
juror in question.Â  Id. at 358Â59; see also
Miller-El v. Cockrell, 537 U.S. 322, 328 (2003).Â  In light of this information, the trial court
must then determine whether the defendant has shown purposeful
discrimination.Â  Miller-El, 537 U.S. at 328Â29.

Â Â Â Â Â Â Â Â Â Â Â  We should
review a Batson claim

Â 

by an examination of the record in the light
most favorable to the ruling of the trial court. Â The standard of review is whether the ruling
of the trial court was or was not Âclearly erroneous.Â Â If supported by the record, including the voir
dire, the prosecutorÂs explanation of his use of a peremptory challenge, the
rebuttal by appellant and impeaching evidence, the decision of the trial court
will not be clearly erroneous.

Â 

Camacho v. State, 864 S.W.2d 524, 528 (Tex. Crim. App. 1993)
(citations omitted).Â  To determine
whether the trial courtÂs ruling was clearly erroneous, we examine the record
to determine whether the ruling leaves us with a Âdefinite and firm conviction
that a mistake has been committed.ÂÂ  Guzman v. State, 85 S.W.3d 242, 254
(Tex. Crim. App. 2002).Â  The trial
courtÂs decision on the issue of pretext is solely a question of fact.Â  Gibson
v. State, 144 S.W.2d 530, 534 (Tex. Crim. App. 2004).Â  The trial court is therefore in the best
position to make that credibility determination.Â  Id.

The trial courtÂs ruling in the third step must
be sustained on appeal unless it is clearly erroneous.Â  Because the trial courtÂs ruling requires an
evaluation of the credibility and demeanor of prosecutors and venire members,
and because this evaluation lies peculiarly within the trial courtÂs province,
we defer to the trial court in the absence of exceptional circumstances.

Â 

Grant v. State,
325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citations omitted).

Â 

(1)Â Â Â Â Â Â Â  The State Proffered Manifestly
Race-Neutral Explanations for Its Strikes

Â 

Â Â Â Â Â Â Â Â Â Â Â  The first of the two veniremembersÂwho were struck by
the State and whose removal has been challenged by HawkinsÂwas Vickie
Washington.Â  Counsel for the State
testified that Washington was struck from the panel because Âshe felt some
discomfort with racism involving police in Smith County,Â and believed some
police officers acted on racism in Smith County.Â  The StateÂs attorney further testified that
Washington was struck because, though listed as a possible witness in an
indecency-with-a-child case, she failed to raise her hand when asked on voir
dire whether she had knowledge of any similar cases.Â  In addition, Washington hesitated to answer
the StateÂs question regarding law enforcement and prejudice during the StateÂs
voir dire:

With regard to Number 20, as a parole officer,
she was very hesitant and very concerned about the race, and she wouldnÂt even
-- she hesitated to answer my question.[5]

Â 

I even commented upon that, because there --
there is a concern that they are affected by it in a way that would be adverse
to my position before I even get a shot to do it.

Â 

Â Â Â Â Â Â Â Â Â Â Â  In denying
the Batson challenge to Washington,
the trial court found

Â 

[T]hat the State has expressed race-neutral
reasons, specifically the hesitance to answer, her lack of forthrightness, her --
the tendency of a parole officer to be geared toward rehabilitation rather than
punishment, which is often what the State is looking for, and then really her
lack of a square answer with regard to the prejudice question.

Â 

The Court does find those are race-neutral
reasons and denies the challenge under Batson
as to Juror Number 20.

Â 

Â Â Â Â Â Â Â Â Â Â Â  The State
articulated race-neutral reasons for striking Washington.Â  See
Purkett v. Elem, 514 U.S. 765, 768 (1995) (unless discriminatory intent
inherent in prosecutorÂs explanation, offered reason deemed race neutral); see also Williams v. State, 301 S.W.3d 675, 689 (Tex. Crim. App. 2009)
(veniremember Ânever would quite answer the questionÂ).Â  Striking a potential juror for being hesitant
in answering questions during voir dire is a valid, race-neutral
explanation.Â  See Kennerson v. State,
984 S.W.2d 705, 708 (Tex. App.ÂHouston [1st Dist.] 1998, pet. refÂd).

Â Â Â Â Â Â Â Â Â Â Â  The
proponent of the strike need only tender a facially race-neutral reason for the
strike.Â  The ultimate plausibility of
that explanation is to be considered as part of the third step, in which the
court determines whether the opponent of the strike has satisfied the burden of
persuasion to establish by a preponderance of the evidence that the strike was
the product of the proponentÂs purposeful discrimination.Â  Watkins v. State, 245 S.W.3d 444, 447
(Tex. Crim. App. 2008).

Â Â Â Â Â Â Â Â Â Â Â  Here,
Hawkins claims the StateÂs explanation of concern about WashingtonÂs views of
Smith County law enforcement as prejudiced or racist is merely a pretext for
discrimination.Â  This concern, Hawkins
maintains, could have easily been resolved by further questioning of
Washington, and the failure to do so exposes the weakness of the StateÂs
explanation.Â  See Chambers v. State, 866 S.W.2d 9, 24Â25 (Tex. Crim. App. 1993)
(lack of questioning might expose weakness of StateÂs explanation).Â  Even so, Âthe State is not required to ask a
specified rubric of questions.ÂÂ  Id. at 24.

Â Â Â Â Â Â Â Â Â Â Â  The
State suspected that Washington would not be a good juror because she hesitated
in responding to questions, expressed concerns regarding prejudice by law
enforcement, demonstrated a lack of candor, and, because she was a parole
officer, she might be geared toward rehabilitation rather than punishment.Â  Under these circumstances, Hawkins has failed
to demonstrate that the StateÂs explanation of WashingtonÂs hesitancy in
responding to questions and concern about race did not constitute manifestly
race-neutral explanations for striking Washington.Â  Hawkins also has not attempted to demonstrate
how the StateÂs concern regarding a lack of candor[6]
and WashingtonÂs employment as a parole officer[7]
are not race-neutral explanations for striking Washington.Â  See Middleton
v. State, 187 S.W.3d 134, 142 (Tex. App.ÂTexarkana 2006, no pet.)
(venirememberÂs employment is race-neutral explanation, if State has had poor
success with that type worker).Â  The
State provided race-neutral explanations for its peremptory strike against
Washington, none of which were indicative of purposeful discrimination.

Â Â Â Â Â Â Â Â Â Â Â  The second
veniremember in question was Ralph Thompson.Â 
Counsel for the State testified that Thompson was struck because he had
been previously convicted for assault and driving while intoxicated. Â The State further indicated Thompson was
struck because he believed Smith County law enforcement was prejudiced.[8]Â  In overruling HawkinsÂ Batson challenge, the trial court found ThompsonÂs prior
convictions (although Thompson was not asked about them) to be a race-neutral
reason for the exercise of the peremptory strike.Â  See
Partida v. State, 133 S.W.3d 738, 742
(Tex. App.ÂCorpus Christi 2003, no pet.) (criminal history is race-neutral
reason for striking from panel).

Â Â Â Â Â Â Â Â Â Â Â  The
questioning of Thompson failed to indicate, however, that Thompson believed
Smith County law enforcement was prejudicedÂone of the reasons given by the
State for the exercise of a peremptory challenge against Thompson.Â  To the contrary, ThompsonÂs responses
reflected his belief that Smith County law enforcement officers are ÂgoodÂ and
do their jobs well.Â  While this isolated
explanation is factually inaccurate, the State provided a verifiable, race-neutral
explanation for its use of a peremptory strike against Thompson, and the trial
court overruled HawkinsÂ Batson
challenge based solely on the race-neutral explanation, as described in the
preceding paragraph of this opinion.Â  The
trial court, thus, did not err in finding the State satisfied its burden of
production to provide race-neutral explanations for its peremptory
strikes.Â  We next turn to step three of
the analysis and examine the plausibility of those race-neutral explanations.

(2)Â Â Â Â Â Â Â  The Trial Court Did Not Clearly Err in
Accepting the StateÂs Race-Neutral Explanations Â Â  for Its Strikes

Â 

Â Â Â Â Â Â Â Â Â Â Â  Hawkins
asserts that prejudice in the exercise of the StateÂs peremptory challenges is
evidenced by the line of questioning regarding the issue of racism and prejudice.Â  Initially, Washington was questioned
regarding her views on the issue of whether Smith County law enforcement was
racially prejudiced.Â  Immediately after
Washington was questioned on this issue, the State turned to Thompson, who
claimed no problem in that area.[9]Â  Next, the State questioned veniremember
thirty-one (an African-American later struck for cause) regarding his views on
race relations and law enforcement.[10]Â  The State then questioned veniremember
thirty-eight, the only remaining African-American in the strike zone,[11]
and asked the same types of questions.[12]


Â Â Â Â Â Â Â Â Â Â Â  Hawkins
complains that the State struck two of the three remaining African-Americans in
the strike zone (the fourth having been struck for cause).Â  Moreover, the only persons the State
questioned regarding racism or prejudice were the African-American members of
the panel.[13]Â  Essentially, Hawkins claims the State used
its peremptory challenges at a disproportionate rate to strike African-American
veniremembers[14] and further
directed questions designed to set up peremptory challenges at a
disproportionate rate to African-American veniremembers.

Â Â Â Â Â Â Â Â Â Â Â  Certainly,
this strategy by the StateÂquestioning only minority veniremembers on whether
they viewed Smith County law enforcement as prejudicedÂis certain to raise
eyebrows and put the State in a vulnerable position in trying to defend against
this Batson challenge.Â  The trial court could have justifiably found
a pretext based on this selective questioning, given the situation
presented.Â  But it did not so find.Â  Our job is not to rule based on what we would
have found, had we been in the trial courtÂs position, but to determine whether
the trial courtÂs ruling was clearly erroneous.Â 
Grant, 325 S.W.3d at 657.

Â Â Â Â Â Â Â Â Â Â Â  Similar
concerns were addressed in Watkins v.
State, 245 S.W.3d 444 (Tex. Crim. App. 2008).Â  In that case, of the first thirty-seven
veniremembers, eight were African-American.Â 
The State used six of its eleven peremptory challenges to exclude seven
of the eight African-Americans from the jury pool.Â  Id.
at 451.Â  Faced with disproportionate use
of peremptory challenges, the court recognized: 

[T]his factor [the disproportionate use of
peremptory challenges] does not alone establish that the trial courtÂs
conclusion, that the StateÂs explanations were not pretextual, is clearly
erroneous.Â  In Miller-El,[15]
it was the combined weight of all the factors suggesting pretext that
ultimately convinced the Supreme Court that the deference ordinarily accorded
to the state courtÂs judgment was inappropriate.Â  Similarly, a reviewing court should look to
all relevant factors in deciding whether the trial courtÂs finding was clearly erroneous.

Â 

Id. at 452.

Â 

Â Â Â Â Â Â Â Â Â Â Â  Watkins also involved the issue of
disparate questioning.Â  The State
questioned African-American veniremembers about their ability to convict based
on circumstantial evidence at twice the rate one would expect from a random
selection.Â  Id. Â The court concluded, however,
that, while one of the StateÂs main lines of questioning Âseemed suspiciously
directed toward African-Americans, the two others manifestly were not.ÂÂ  Id.
at 453. Â While disparate questioning was
some evidence Âthat would support a finding that the prosecutorÂs explanations
were pretextual, the trial court found no pretext.Â  Nor can we say that this evidence, at least
by itself, compels a conclusion that the trial court clearly erred.ÂÂ  Id.

Â Â Â Â Â Â Â Â Â Â Â  Here, the StateÂs questioning of only
African-American veniremembers about their opinion of racial prejudice among
Smith County law enforcementÂwhich one might suppose is predominantly CaucasionÂis
evidence the State directed questions designed to set up peremptory challenges
at a disproportionate rate to African-American veniremembers.Â  As in Watkins,
the StateÂs remaining areas of questioning were not Âsuspiciously directed
toward African-Americans.Â[16]

Â Â Â Â Â Â Â Â Â Â Â  The StateÂs
use of peremptory challenges against two of the three remaining
African-Americans in the strike zone is disproportionate.

Â Â Â Â Â Â Â Â Â Â Â  But,
neither of these factors, standing alone, can support the conclusion that the
trial court erroneously determined that the StateÂs explanations for the
exercise of its peremptory challenges were not pretextual.Â  Id.
at 451, 453.Â  The question becomes, then,
one of whether these two factors, when combined, compel the conclusion that the
trial court erred in finding a lack of pretext for the StateÂs race-neutral
explanations for its peremptory challenges to Washington and Thompson.Â  We conclude they do not.

Â Â Â Â Â Â Â Â Â Â Â  In Watkins, the court acknowledged Âthere
was evidence in the record from which a rational judge could have concluded
that the StateÂs race-neutral explanations for peremptory challenges . . . were
but a pretext for race-based exclusion.Â[17]Â  Id.
at 456.Â  The court recognized, however,
that

this is not a case, like MillerÂEl, in which every relevant
factor firmly supports a conclusion of pretext. Â The prosecutorÂs explanations for why he
peremptorily struck Berry and Davis were manifestly race-neutral. Â It was the appellantÂs ultimate burden to
persuade the trial court that those explanations were incredible or
disingenuous. Â The State struck other,
non-African-American veniremen for the same reason that it struck Berry. Â And it is apparent that Davis was struck
because she gave an answer that was different from, and more objectionable to
the State than, the answers it received from non-African-Americans to the same
line of questioning. Â Thus, the record
also supports a conclusion that the StateÂs race-neutral explanations were not
a pretext.

Â 

Id. at 457.Â  Further,

Â 

In MillerÂEl v. Dretke, the Supreme Court treated the
question of pretext as a question of fact.Â 
We also regard it as a fact question, for the trial court to resolve,
subject to reversal on appeal only for clear error.Â  Because the record supports the trial
courtÂs resolution of this fact question, we cannot say that it clearly erred,
even though the record might support an opposite resolution as well.

Â 

Id. (citations
omitted).

Â 

Â Â Â Â Â Â Â Â Â Â Â  In this case, as
in Watkins, the State provided
manifestly race-neutral explanations for its use of peremptory strikes against
Washington and Thompson.Â  It was HawkinsÂ
burden to persuade the trial court that those explanations were Âincredible or
disingenuous.Â Â See id.Â  Hawkins does not argue, and did not present
evidence at the Batson hearing, that
the State engaged in disparate treatment by failing to strike similarly
situated white veniremembers with criminal histories, who expressed hesitancy
in answering questions, who were employed as parole officers, or who had
previously served as a witness (or possible witness) at a criminal trial
involving a similar type of offense.Â 
And, while it is true that some evidence at voir dire could support an
inference of pretext, the question of pretext is one of fact.Â  Id.Â  Because the record supports the trial courtÂs
resolution of this fact question, we cannot say the decision of the trial court
is clearly erroneous.

Â Â Â Â Â Â Â Â Â Â Â  We affirm
the judgment of the trial court. 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  January
10, 2012Â Â Â Â Â Â Â Â  

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  January
25, 2012

Â 

Do Not Publish











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.Â  See Tex. GovÂt Code Ann.
Â§ 73.001 (West 2005).Â  We are unaware of
any conflict between precedent of the Twelfth Court of Appeals and that of this
Court on any relevant issue.Â  See Tex.
R. App. P. 41.3.

Â 





[2]See Batson v. Kentucky, 476 U.S. 79
(1986).

Â 





[3]The
alleged offense occurred in 1992, and Hawkins was initially convicted of
indecency with a child and sentenced to twenty yearsÂ imprisonment in
1993.Â  After HawkinsÂ initial appeal was
dismissed as not timely filed, he was granted an out-of-time appeal.Â  That appeal was likewise dismissed due to a
lack of certification of right to appeal.Â 
After Hawkins was granted a second out-of-time appeal, the Court of
Appeals for the Twelfth District reversed the judgment of the trial court and
remanded to the trial court for a new trial.Â 
This trial resulted in the judgment from which Hawkins now appeals.

Â 





[4]Hawkins
challenged the StateÂs peremptory strikes on juror numbers twenty and
twenty-four.Â  

Â 





[5]This
testimony concerns the following exchange between Washington and counsel for
the State:

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Is there any problem, from a
racial standpoint, with the police -- or any Â any kind of law enforcement in
the Smith County area?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  WASHINGTON:Â  Well, I donÂt know how to answer it.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ItÂs a hard question.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  WASHINGTON:
ItÂs very hard.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  WASHINGTON:Â  Because you see a whole lot of different
things.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Yes, maÂam, you do.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  WASHINGTON:Â  A lot.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  .
. . . 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  . . . And you hesitated, see, and
you -- you know, itÂs like the longer you hesitate, the more I realize you have
some discomfort about that; fair to say?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  WASHINGTON:Â  Yes, it is.

Â 

Â 





[6]Counsel
for Hawkins testified that Washington did not disclose her previous service as
a witness in an unrelated indecency trial when asked during voir dire:

Â 

Anybody worried
about the time or anybody on this side that either was a victim or knows a
victim of some kind of sexual crime?Â  Put
it that way.

Â 

Either a close
family member or a close personal friend, anybody that has any of that in their
background?Â  

Â 





[7]During
the StateÂs voir dire, Washington indicated that she worked as a parole officer
for almost ten years.Â  One of the StateÂs
explanations for striking Washington was based on her employment.Â  Counsel stated,

Â 

We also talked about the
parole officer and the corrections officer.Â 
We look -- I personally look at those, no matter what their color, very
closely all the time because of experiences IÂve had throughout my career with
people who begin to -- to identify, and, in fact, some even begin to associate
with the people that [they] are supervising, and we concern ourselves with
that.

Â 

Â 





[8]The
exchange with Thompson (veniremember number twenty-four) prompting the
peremptory challenge follows:

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Have you ever had a bad
experience with a police officer?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  Getting stopped for no reason.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  .
. . .

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Is there anything about those
experiences that would cause you a problem with a Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  police officer around here?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  No.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  .
. . .

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Give me an assessment.Â  Police officers in Smith County, general
assessment, good or bad?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  Good.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  They do their -- they do their
jobs and do them well?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  Yes, sir.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Okay.Â  Just because of that, are you going to
automatically believe them?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  No.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [STATE]:Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Are you going to automatically disbelieve
them?

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THOMPSON:Â Â Â Â Â Â  No.

Â 





[9]When
asked if he perceived any problem Âwith the law enforcement people of Smith
County with regard to racial issues,Â Thompson replied that he perceived no
such problem.Â  

Â 





[10]This
veniremember indicated he believes there is some degree of racial prejudice in
Smith County law enforcement.Â  

Â 





[11]The
trial court noted for the record that those African-American veniremembers
within the strike zone were numbers twenty, twenty-four, thirty-one, and
thirty-eight.Â  There was one additional
African-American on the panel, outside the strike zone.Â  

Â 





[12]Veniremember
thirty-eight indicated he believes Smith County law enforcement engages in
racial stereotyping.Â  

Â 





[13]Counsel
for the State testified that, after reviewing his voir dire notes, he did not
believe other veniremembers were asked about racism in Smith County.Â  Our review of the record reveals that only
the four African-American veniremembers in the strike zone were asked about
prejudice or racism in Smith County law enforcement.

Â 





[14]Although
the record does not reflect the number of strikes utilized on veniremembers
other than African-Americans, we presume, based on HawkinsÂ argument and the
StateÂs response, that the remainder of the StateÂs strikes was used on
non-African-American veniremembers.

Â 





[15]The
Miller-El factors included (1) the
use of peremptory challenges to eliminate a far greater proportion of
African-American veniremembers than non-African-American veniremembers, (2) the
reasons asserted for eliminating two African-American veniremembers appeared to
apply equally well to many of the non-African-American veniremembers who were
not challenged, (3) utilization by the State of the option to shuffle the jury
panel in a manner that supported an inference of race discrimination, (4)
utilization of questioning specifically designed to elicit grounds for
peremptory challenges disproportionately, in a manner that suggested an intent
to single out African-American veniremembers for elimination, and (5) that the
county in which Miller-El was
prosecuted followed a formal policy to exclude minorities from jury service. Â Miller-El
v. Dretke, 545 U.S. 231, 240Â63
(2005). The cumulative impact of these none-exclusive factors caused the United
States Supreme Court to conclude that Âits direction is too powerful to
conclude anything but discrimination.ÂÂ  Id. at 265.

Â 





[16]The
State engaged in five primary lines of questioning, including judging the
credibility of witnesses, the panelÂs experience with law enforcement, the
length of time between the offense and trial, whether the veniremembers have
been or know someone who has been a crime victim, and the StateÂs burden of
proof in general and in light of certain categories of evidence.Â  In questioning the panel regarding its
experiences with law enforcement, the State turned to the issue of racism and
prejudice.Â  Only veniremembers twenty, twenty-four,
thirty-one, and thirty-eight (all African-American) were called on individually
for their assessment of prejudice in Smith County law enforcement.Â  

Â 





[17]The
court elaborated:

Â 

The numbers
support the appellant. The State exercised its peremptory challenges against AfricanÂAmerican
veniremen at a grossly disproportionate rate as compared to
non-African-Americans. Â This fact serves
not only to establish the appellantÂs prima facie case of racial discrimination
(if that were needed in this case), but also as evidence in support of his
ultimate burden of persuasion. Â Moreover,
the prosecutor directed at least one line of questioning designed to ferret out
objectionable jurors toward AfricanÂAmerican veniremen at twice the rate one
would expect from random selection. Â The
trial court may (or may not) have found that the prosecutorÂs motive in
peremptorily striking another AfricanÂAmerican prospective juror was racial. Â These facts militate in favor of a finding of
pretext, and would have supported a trial courtÂs ruling to that effect. Â 

Â 

Id. at 456Â57.

Â